# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs December 3, 2013

## STATE OF TENNESSEE v. ROOSEVELT BRICE, JR.

### Appeal from the Circuit Court for Madison County
### No. 12-282   Donald H. Allen, Judge

### No. W2013-00349-CCA-R3-CD  - Filed January 16, 2014

Roosevelt Brice, Jr. ("the Defendant") was convicted by a jury of attempted premeditated first degree murder and aggravated assault.  Following a sentencing hearing, the trial court sentenced the Defendant to twenty-five years' incarceration for his attempted premeditated first degree murder conviction and fifteen years' incarceration for his aggravated assault conviction.  The trial court ordered that the two sentences be served concurrently for a total effective sentence of twenty-five years.  In this direct appeal, the Defendant challenges the sufficiency of the evidence supporting his conviction for attempted premeditated first degree murder.  After a thorough review of the record and applicable law, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments
### of the Circuit Court Affirmed

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Gregory D. Gookin, Assistant Public Defender, Jackson, Tennessee, for the appellant, Roosevelt Brice, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; James G. Woodall, District Attorney General; and Brian Gilliam, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

A Madison County Grand Jury indicted the Defendant on one count of attempted premeditated first degree murder and one count of aggravated assault. The Defendant proceeded to a jury trial on October 2, 2012.

Alma Brice testified that she was married to the victim, Roosevelt Brice, Sr., and that they lived together in their home in Madison County. She identified the Defendant as her stepson. Alma[1] testified that the Defendant spent the night at her home on January 6, 2012. The Defendant lived in Nashville and was in Jackson visiting family. On January 7, 2012, the Defendant had been gone all day and had not yet arrived home by the time Alma went to bed between 9:30 p.m. and 10:00 p.m. Alma testified that she was awakened by the sound of Roosevelt Sr. and the Defendant arguing. Alma heard Roosevelt Sr. say, "Well, you're going to leave. You are going to leave. I done told you about coming in here trying to run my house." According to Alma, the Defendant responded, "I'm not going nowhere [sic] because this is my house too." At that point, Roosevelt Sr. went into the kitchen. When Roosevelt Sr. attempted to exit the kitchen back into the den,

> [The Defendant] jumped up and met him in the doorway and he told him he said, "If you call the police on me tonight, you old so-in-so [sic], I'm going to kill you." [The Defendant] said, "You're the only one left and I'm going to take you out tonight." Meaning all the rest of [Roosevelt Sr.'s] sisters and brothers.

At that time, the Defendant pushed Roosevelt Sr., and, when Roosevelt Sr. pushed the Defendant back, the Defendant "took [Roosevelt Sr.] down to the floor . . . and [the Defendant] was chocking [sic] [Roosevelt Sr.] out." Alma testified that Roosevelt Sr. was positioned on top of the Defendant when the Defendant was choking him. While he was choking Roosevelt Sr., the Defendant "told [Roosevelt Sr.] that he was going to kill him." Eventually, Alma was able to get Roosevelt Sr. loose from the Defendant. At that point, the Defendant "attacked [Roosevelt Sr.] again and threw him through the wall . . . that's when [the Defendant] got down on [Roosevelt Sr.] and proceeded to beat him and beat him and beat him." Alma "begged" the Defendant to stop, and the Defendant "just kept telling [Roosevelt Sr.] that he was going to die tonight and he hadn't never [sic] cared anything

---

[1] Because more than one witness has the same surname, we will refer to these witnesses using their given names. We intend no disrespect.

about him anyway." Alma clarified that by "beat him" she meant that the Defendant was "beating [Roosevelt Sr.] with his fists and his hands and stomping him and kicking him."

Alma stated that, when the Defendant "came up off" Roosevelt Sr., she could see that the Defendant had a knife in his hand. According to her testimony, that was the first time Alma saw anybody with a knife. She noted that the knife was "bent," and she saw blood on it. She recognized the knife as one that they normally kept in the kitchen. She "kept asking [the Defendant] to give [her] the knife and he wouldn't." According to Alma's testimony, "[F]inally, [the Defendant] just threw [the knife] on the table and I picked it up and put it in the garbage can." She stated that she threw the knife in the garbage can because she "didn't want [the Defendant] to get it again." At that point, Alma identified the knife.

Alma testified that, during the incident, she was afraid to call the police because the Defendant had threatened to "do the same thing" to her and her son if she did. Alma's son was a "special needs child," and he was present during the incident. Eventually, Alma went into a bedroom and called 911. She testified that she called and hung up immediately as she "didn't want [the Defendant] to hear" her talking to the 911 dispatcher because she was "afraid of what [the Defendant] might do." When the police arrived, the Defendant met the officers at the front door and told them "everything is all right." Alma gave the officers permission to come inside the house and was "trying to give them the signal" to direct their attention toward the back of the house. Alma stated that, when the officers questioned the Defendant about the blood on his clothes, the Defendant responded, "Well, me and my dad got into it tonight and my mom called me and told me to come on over here." When the officers asked the Defendant where his dad lived, he responded, "Over on Stonewall [S]treet."

Alma testified that the officers "finally caught [her] hint" and moved to the back of the house, where they discovered Roosevelt Sr. lying on the floor in the den. According to Alma, the Defendant "had picked [Roosevelt Sr.] up from the kitchen and threw him in the floor in the den." Alma testified that she thought Roosevelt Sr. was dead at that point. Roosevelt Sr. was not able to speak or move. She tried to wipe some of the blood off of Roosevelt Sr.'s face, but the Defendant "wouldn't let" her, telling her to quit "babying him."

On cross-examination, Alma acknowledged that, in her statement to police on January 9, 2012, she stated that Roosevelt Sr. "had the knife in his hand prior to [the Defendant] attacking him." The statement was reduced to writing by officers, and Alma identified her signature at the bottom of the written statement. She acknowledged that this statement was contrary to her testimony at trial that the Defendant was the only one she saw with the knife.

Alma clarified that when she testified that the Defendant threw Roosevelt Sr. "through the wall" in the kitchen, she meant that "when [the Defendant] threw [Roosevelt Sr.] through the wall in the kitchen, it made a big hole in the wall. . . . [Roosevelt Sr.'s] head was in the hole in the wall and that's where [the Defendant] proceeded to beat him."

Alma testified that, at the time of the incident in question, Roosevelt Sr. was in an "early stage of dementia."

On redirect-examination, Alma clarified her statement contained in the police report regarding Roosevelt Sr. having the knife: "I said [Roosevelt Sr.] may have picked it up when he was in the kitchen by mistake or whatever. He was in the early stages of dementia." When asked if she ever saw Roosevelt Sr. with the knife, she replied that she did not. According to Alma, "The first time I saw the knife was when [the Defendant] had the knife when he was standing up over [Roosevelt Sr.] when he had him down on the floor in the kitchen."

When asked whether she remembered the Defendant making any threats toward Roosevelt Sr. during the incident, Alma remembered, "Oh, yeah. While [the Defendant] was beating [Roosevelt Sr.], [the Defendant] kept on telling him to die and he was going to kill him."

Officer Joseph Mitchell with the Jackson Police Department ("JPD") testified that he was working as a patrol officer on the night of the incident in question and responded to a 911 hang-up call at Alma and Roosevelt Sr.'s home. When Officer Mitchell arrived, Officer Buddy Crowell of the JPD was already there. Officer Mitchell spoke with the Defendant at the door. According to Officer Mitchell, the Defendant stated that "there was nothing going on and that they didn't need the police there."

However, Officer Mitchell noticed blood on the Defendant's shirt, and, after Officer Mitchell expressed his concern, they were given permission to come into the house. At that point, Officer Mitchell noticed that Alma was "motioning [him] with her eyes," and he proceeded toward the back of the house. When he saw blood in the kitchen, he continued to the den where he found Roosevelt Sr. lying "in a puddle of blood on his back." Officer Mitchell described Roosevelt Sr.'s condition: "He was in horrible condition. I mean, just beat. It's unbelievable. His eyes were all swollen and blood was all on his shirt and it was kind of almost looked like somebody outlined his head to his belt line in blood." Roosevelt Sr. had "barely any strength" to move his arms, and he was not able to speak except for "mumbling a little." Officer Mitchell identified several pictures that he took of the scene and of Roosevelt Sr.'s wounds. Officer Mitchell also identified the knife that he collected from the scene.

-4-

According to Officer Mitchell, the Defendant stated that he and Roosevelt Sr. "had gotten into an altercation at another location and came back to the house to, you know, calm down to air it out and stuff. . . . [T]hen an altercation came and one way or another [the Defendant] got [Roosevelt Sr.] down on the floor and started kicking and stomping him."

Officer Mitchell identified a pair of shoes he collected from the scene. One of the shoes was retrieved from the kitchen, and the Defendant was wearing the other shoe at the time he was arrested. Officer Mitchell noted that there was blood on the shoes. According to Officer Mitchell, the Defendant explained that "Roosevelt Sr. was on the ground, [and the Defendant] kicked and stomped him. So that's how the blood got on his shoes." Officer Mitchell testified that he did not notice any bruises, cuts, or any other kind of injuries on the Defendant at the time he was arrested.

On cross-examination, Officer Mitchell testified that the Defendant had a "strong odor" of alcohol coming from his body.

Officer Buddy Crowell with the JPD testified that he also was working as a patrol officer on the night of the incident in question and responded to the 911 hang-up call at Alma and Roosevelt Sr.'s home. Officer Crowell arrived at "approximately the same time" as Officer Mitchell. Officer Crowell testified that he spoke with Alma at the front door. Officer Crowell remembered that Alma "kind of had the look on her face like something was wrong," and "kind of looked back over her shoulder." According to Officer Crowell, "I interpreted [Alma's body language] as something was going on that was not in my sight, so I asked if I could come in." Alma gave the officers permission to enter the house. Once in the house, Officer Crowell noticed blood "all over" the Defendant's clothes. When asked about the blood, the Defendant, "advised [Officer Crowell] that him and his father had been in a fight at a different location, and [the Defendant] had come to [Alma's] house to calm down."

Eventually, Officer Mitchell drew Officer Crowell's attention to the den where Officer Crowell could see Roosevelt Sr. lying on the ground. At that point, Officer Crowell arrested the Defendant. When asked about Roosevelt Sr.'s condition, Officer Crowell stated, "He was in very bad shape. He wasn't able to talk or respond to me or anything. He was able to move his head and that was about it." Officer Crowell did not remember the Defendant complaining of any injuries, and he did not see any signs of injury on the Defendant. Officer Crowell testified that the Defendant smelled of alcohol.

On cross-examination, Officer Crowell admitted that nothing in his report mentioned Alma looking over her shoulder or signaling the officers toward the back of the house.

Lisa Headen, an investigator with the domestic violence unit of the JPD, testified that she interviewed the Defendant following the incident in question. Investigator Headen testified that she hand-recorded the Defendant's statement, and, after having a chance to review the written statement and make any necessary changes, the Defendant signed it. In this statement, the Defendant claimed, "I don't really know what happened. I don't remember how it started. My daddy hit me too."

On cross-examination, Investigator Headen clarified that her involvement with this case ended "probably the next day" following her interview with the Defendant because the case was transferred to the violent crimes unit "as it became more apparent how horrific the injuries were."

Aubrey Richardson, an investigator in the violent crimes unit of the JPD, testified that she was assigned as the investigator in this case after it was transferred from the domestic violence unit. Investigator Richardson testified that no evidence was submitted to the Tennessee Bureau of Investigation for any kind of scientific testing in this case because she "felt like there was nothing to be discovered" by doing so.

The State also entered without objection medical records from Jackson Madison County General Hospital pertaining to Roosevelt Sr.'s treatment there immediately following the incident in question. The medical records showed that Roosevelt Sr. was admitted to treatment between 1:00 a.m. and 2:00 a.m. on January 8, 2012, and was discharged on January 16, 2012. The medical records noted that Roosevelt Sr. suffered "blunt trauma" with a diagnosis of "[t]raumatic intracranial hemorrhage," "[c]losed fracture of the facial bones," "[c]ontusion of the chest wall," "left nasal bone fracture," and "left orbital floor fracture."

At the conclusion of the State's proof, the defense moved for a judgment of acquittal, and the trial court denied the motion.

The Defendant chose to testify on his own behalf. The Defendant testified that he lived in Nashville and occasionally took trips to visit his family in Jackson. Regarding how much alcohol he had consumed prior to the incident in question, the Defendant testified that he only had consumed "a beer earlier that day" and denied having had any liquor on the night of the incident.

On the night in question, the Defendant arrived at the house around 10:30 p.m. and let himself in using a key Alma had given him. The Defendant first encountered Roosevelt Sr. in the kitchen. According to the Defendant, "[Roosevelt Sr.] was asking me where was I coming from and how did I get into the house. The whole ordeal started over because I

wouldn't give him the door key to the house." At that point, the Defendant testified, their argument became physical:

> [Roosevelt Sr.] pushed me and I pushed him back. When he pushed me again, I reached down and [Roosevelt Sr.] stuck me in my right arm with that steak knife that we've got in here now as the weapon. So after he stuck me, that's when I pushed him over there in the corner [of the kitchen]. I pushed him down on the floor trying to get the steak knife away from him. . . . So, from there on that's where I scuffled with him trying to get the knife from him and I couldn't get the knife. That's when Alma came in . . . . When she came in the room, she reached down to pull [Roosevelt Sr.] from up under me, so I got up off [Roosevelt Sr.] thinking that she was going to get the knife away from him, but he still didn't give up the knife. I was determined I wanted the knife because he didn't have no business sticking me with the knife and that's when I pushed him over the den couch and he fell down between the couch and the living room table . . . that's where the officer found him. I didn't get the knife away from him until after I got around there. True enough, I stomped him. That's how I got him to release the knife. Other than that, after I got the knife from [Roosevelt Sr.], by that time the police was at the back . . . . So that's when we went to the door and opened the door.

According to the Defendant, he never used the knife to cut or stab Roosevelt Sr. Rather, when he gained control of the knife, the Defendant placed it on the living room table before Alma retrieved it and put in the garbage can. The Defendant testified that he was just "trying to leave. That was it." He testified, "I wasn't trying to kill my father. . . . I was trying to get the knife."

On cross-examination, the Defendant admitted, "[I]t was to where after [Roosevelt Sr.] stuck me with the knife I was upset and I lost it. That's the reason I stomped him." The Defendant also testified that, on the night of the incident, the Defendant told the officers that Roosevelt Sr. had stabbed him with the knife. The Defendant stated that he was "sorry about anything else." When the State asked the Defendant what he was sorry about, the Defendant replied, "I'm sorry that my daddy got stuck." However, when pressed by the State, the Defendant continued to deny that he had stabbed Roosevelt Sr.

When asked why he initially told the officers that he had been in a fight at another address, the Defendant responded, "[B]ecause I was trying to keep from going to jail, sir, because the police was there." The Defendant testified that he never pushed Roosevelt Sr. into the kitchen wall. He denied making any statements the night of the incident that he was

going to kill Roosevelt Sr. or that Roosevelt Sr. was going to die. He also denied threatening to attack Alma if she called the police.

After the Defendant's testimony, the defense rested its proof. The jury deliberated and found the Defendant guilty as charged of attempted premeditated first degree murder and aggravated assault. The trial court later sentenced the Defendant to twenty-five years for his attempted premeditated first degree murder conviction and to fifteen years for his aggravated assault conviction, to be served concurrently. The Defendant filed a motion for new trial, which the trial court denied. The Defendant then filed a timely notice of appeal. In this direct appeal, the Defendant argues that the evidence at trial was not sufficient to support his conviction for attempted premeditated first degree murder.

## Analysis

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our supreme court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

The weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Furthermore, it is not the role of this Court to reevaluate the evidence or

substitute its own inferences for those drawn by the jury. State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003) (citations omitted).

The Defendant challenges the sufficiency of the State's evidence supporting his conviction for attempted premeditated first degree murder. Specifically, the Defendant asserts that "the argument only started when [Roosevelt Sr.] confronted [the Defendant]" and that the Defendant only "stomped and kicked [Roosevelt Sr.] in an attempt to wrest control of the knife." Therefore, the Defendant argues, the "proof demonstrates that [the Defendant] had no intention to kill his father and that he did not commit his crimes with premeditation."

The definition of first degree murder applicable in the instant case is the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2010). In order to prove attempted premeditated first degree murder, the State must prove that the Defendant acted with the intent to commit premeditated first degree murder and that the Defendant's "conduct constitute[d] a substantial step toward commission of the offense." Tenn. Code Ann. 39-12-101(a) (2010).

A premeditated act is one done "after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). Therefore, the premeditated killing of another "means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id. Furthermore, the accused must be "sufficiently free from excitement and passion as to be capable of premeditation." Id. In a trial for first-degree murder, "[t]he existence of the element of premeditation is a question of fact to be resolved by the jury." State v. Davis, 354 S.W.3d 718, 730 (Tenn. 2011); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997) ("The elements of premeditation and deliberation are questions for the jury."). Premeditation "may be established by proof of the circumstances surrounding the killing." Bland, 958 S.W.2d at 660. Circumstances that support a finding of premeditation include: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; [and] the declarations by the defendant of an intent to kill." State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); see also Bland, 958 S.W.2d at 660.

In the instant case, Alma testified that, while he was choking Roosevelt Sr., the Defendant declared "that he was going to kill him." According to Alma, there was a brief break in the action when she was able to separate the two, but the Defendant attacked Roosevelt Sr. again, throwing him "through the wall," and proceeding to "beat him, and beat him, and beat him." While he was beating Roosevelt Sr., the Defendant again "told [Roosevelt Sr.] that he was going to kill him," and the Defendant just kept telling [Roosevelt Sr.] that he was going to die tonight." Alma testified that she saw a bloody bent knife in the Defendant's hand and that she never saw Roosevelt Sr. with a knife. Furthermore, the

testimony of Alma and the two responding officers, the crime scene photographs, and Roosevelt Sr.'s medical records all show the severity of the injuries Roosevelt Sr. sustained. Alma testified that she thought Roosevelt Sr. was dead. Officer Mitchell testified that Roosevelt Sr. was in "horrible condition" and that he was covered in blood and unable to speak. The medical records entered without objection show that Roosevelt Sr. required an eight-day hospitalization and suffered intracranial hemorrhaging along with multiple fractures to his face.

This evidence was sufficient to lead the jury to conclude that the Defendant used a deadly weapon on an unarmed victim, that the Defendant made declarations of his intent to kill Roosevelt Sr. during the attack, and that the attack was particularly brutal. Although the Defendant's own testimony contradicted some of this evidence, "the weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact" for the jury. Bland, 958 S.W.2d at 659. The evidence was clearly sufficient to persuade a rational trier of fact to conclude that the Defendant had the requisite premeditation to support his conviction for attempted premeditated first degree murder. Thus, the Defendant is entitled to no relief on this basis.

## CONCLUSION

For the reasons set forth above, we affirm the judgments of the trial court.

_____
JEFFREY S. BIVINS, JUDGE

-10-